UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS DAVID STANLEY

     *Plaintiff*,

*v.*

COMISSIONER OF SOCIAL
SECURITY,

     *Defendant*.

_____/

CASE NO. 2:20-CV-11868

HON. GEORGE CARAM STEEH
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 19)

### I.    RECOMMENDATION

Plaintiff Thomas Stanley challenges the Commissioner of Social Security regarding a final decision denying his claim for Supplemental Security Income benefits ("SSI"). The case was referred to the undersigned for review. (ECF No. 21); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 13), **GRANTING** the Commissioner's motion, (ECF No. 19), and affirming the decision.

### II.    REPORT

#### A. Introduction and Procedural History

Plaintiff's application for SSI was filed on December 4, 2017. (ECF No. 11-5, PageID.204; ECF No. 11-3, PageID.134.) He alleged that he became disabled on July 25,

2017.  (ECF No. 11-5, PageID.204.)  The Commissioner denied the claim on April 2, 2018. (ECF No. 11-4, PageID.137.)  Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on April 26, 2019.  (ECF No. 11-2, PageID.84.)  The ALJ issued a decision on June 14, 2019, finding that Plaintiff was not disabled.  (*Id*. at PageID.71.)  The Appeals Council denied review on May 13, 2020.  (*Id.* at PageID.46.) Plaintiff sought judicial review on July 9, 2020.  (ECF No. 1.)  The parties filed cross-motions for summary judgment and briefing is complete.  (ECF Nos. 13, 19.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 11-2, PageID.70.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since "December 4, 2017, the application date." (*Id.* at PageID.57.) At step two, the ALJ concluded that Plaintiff had the following severe

4

impairments: degenerative disc disease, right hip impingement, diabetes, depression, and a mild cognitive impairment. (*Id.*) The ALJ found that Plaintiff experienced headaches as a non-severe impairment. (*Id.* at PageID.57-58.) None of these impairments met or medically equaled a listed impairment at step three. (*Id.* at PageID.58.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 416.967(a) except claimant requires a sit/stand option at intervals as short as 30 minutes; can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; no work at unprotected heights; and occasionally in vibration. In addition, the claimant is limited to semiskilled or unskilled work and in addition to normal breaks would be off task less than 10% of the time in an 8-hour workday.

(*Id.* at PageID.61.) At step four, the ALJ wrote "transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (*Id.* at PageID.69) (citation omitted.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including, work as an information clerk, office clerk, or interviewer. (*Id.* at PageID.70.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.*)

### E.  Administrative Record

#### i.    Medical Evidence

Plaintiff's injuries and medical impairments stem from an automobile accident occurring on Plaintiff's alleged onset date, July 25, 2017. (ECF No. 13, PageID.1445.) On that date, Plaintiff was driving southbound on M-13 when "his left front tire blew out causing him to lose control, leave the roadway, and rollover." (*Id.*; ECF No. 11-7,

PageID.338.) As a result, Plaintiff suffered "severe lacerations to his head" (ECF No. 11-6, PageID.248) and later reported injuries including spinal and hip injuries, lacerations, migraines, post-concussion syndrome, diabetes, and depression. (ECF No. 11-2, PageID.61; ECF No. 11-6, PageID.262.) On July 28, 2017, he was prescribed a "hospital bed, high-rise toilet, hip kit, shower bench, standard walker, [and] regular wheelchair." (ECF No. 11-7, PageID.344.) He also received prescriptions for "medical transport," "home care SN, PT, OT, to evaluate and treat," and for "attendant care [four] hours per day [for] [two] weeks [and then be] reevaluate[d.]" (ECF No. 11-7, PageID.345-47.)

The ALJ considered medical opinions from Paul LaClair, M.D., Jeffrey Lawley, D.O., and state agency medical consultant David Kroning, M.D. (ECF No. 11-2, PageID.67-68.)

Dr. LaClair had been seeing Plaintiff every three months beginning in January 2018 and diagnosed Plaintiff with hip impingement, T8 fracture, and cervical and lumbar spondylosis. (ECF No. 11-13, PageID.1431.) Dr. LaClairreported that Plaintiff had an impaired hip range of motion, and noted that injections offer temporary pain relief, analgesic medications offered temporary relief, and physical therapy apparently offered no benefit. (*Id*.) Dr. LaClair opined that, in his opinion, Plaintiff could sit for 30 minutes and stand for 15 minutes at one time and could sit for six hours or stand for two hours in an eight-hour workday. (*Id*. at PageID.1432.) In addition, in Dr. LaClair's opinion, Plaintiff would need a 15-minute break every two to three hours. (*Id*. at PageID.1433.) Plaintiff was not recommended to use to a cane or assistive device. (*Id*.) Although Dr. LaClair noted that

Plaintiff would be off-task 20% of the time due to "significant pain," he ultimately concluded that Plaintiff would be capable of low stress work. (*Id*. at PageID.1435.)

Next the ALJ considered the opinion of Dr. Lawley. Dr. Lawley noted, upon examination of Plaintiff, that his "deep tendon reflexes, motor[,] and sensory exam testing were intact and normal throughout both upper limbs." (ECF No. 11-12, PageID.1168.) He had similar results in his lower limbs. (*Id*. at PageID.1169.)  He had a "slightly diminished active range of motion in all planes" and admitted "to having neck and back pain." (*Id*.) Dr. Lawley noted that "[e]valuation of both hands revealed the presence of palmar calluses of equal amounts. This would be strongly supportive and indicative that he has been performing frequent and recent manual labor using both of his hands." (*Id*. at PageID.1169.) Plaintiff had "a well-maintained thoracic kyphosis and lumbar lordosis" but "had a slightly diminished active range of motion of his lumbar spine in all planes and [was] having mid and lower back pain." (*Id*.) Dr. Lawley reviewed several x-rays of Plaintiff's neck, back, pelvis, and right hip. (*Id*.) The thoracic and cervical spine x-rays were "unremarkable" and the lumbar spine "did not reveal any abnormalities." (*Id*.) The right hip and pelvis x-rays revealed "mild femoral acetabular impingement of equal amounts." (*Id*.) Dr. Lawley concluded that his examinations "reveal[ed] no objective evidence of ongoing pathology that would be suggestive of any pathological condition that would explain or justify [Plaintiff's] ongoing complaints." (Id. at PageID.1170.) He also noted that Plaintiff "does not require any further treatment for his neck, back[,] and right

hip as of today's date and would be capable of returning back to work at his previous job, as well as in the field of common labor without any restrictions[.]" (*Id*.)

Finally, the ALJ considered the opinion of the state agency medical consultant, Dr. Kroning. Dr. Kroning noted that Plaintiff's statements regarding his pain were partially consistent with the medical evidence. (ECF No. 11-3, PageID.124-25.) He noted that in his opinion, Plaintiff could sit for about six hours out of an eight-hour workday and could stand or walk for a total of two hours. (*Id*. at PageID.126.) Dr. Kroning concluded, after a "thorough review" of the medical evidence in Plaintiff's file, that Plaintiff would be "capable of performing work that is not complicated and can be learned in a short period of time and does not require heavy lifting or extended periods of standing or walking." (*Id*. at PageID.132.)

### ii.   Plaintiff's Testimony at the Administrative Hearing

At the April 26, 2019 hearing, Plaintiff testified. (ECF No. 11-2, PageID.86.) The ALJ first asked Plaintiff about his past work. (*Id*. at PageID.90.) Plaintiff worked driving a semi-truck transporting tractor trailers. (*Id*.) The heaviest objects he was required to lift in that role were cases of Gatorade, weighing about 50 pounds. (*Id*. at PageID.90-91.) Plaintiff also worked doing installation of "street lines, water; the mains for the water for cities" where he did "[e]verything; [he] ran the fuel truck, [] dropped off equipment, and ran the equipment." (*Id*. at PageID.91.) He also drove a tractor trailer in that role. (*Id*.) There, the heaviest object he would have to lift was about 100 pounds, which would typically be a "two-person lift." (*Id*. at PageID.92.) Another prior position of Plaintiff's

included driving a tractor trailer and loading or transporting crushed cars and scrap metal from a junkyard to a processing plant. (*Id*.) There, the heaviest object he had to lift was also about 100 pounds. (*Id*. at PageID.93.) Finally, and most recently, Plaintiff worked two jobs in 2017—during the winter, he worked driving and operating equipment that hauled dumpsters, and the second job involved work as an operator and truck driver for a company that "did asphalt." (*Id*. at PageID.94.)

Next, the ALJ invited Plaintiff's counsel to ask Plaintiff about his injuries. (*Id*. at PageID.95.) When asked how often he experienced pain in his hip, Plaintiff replied, "every day, all day." (*Id*. at PageID.95.) He stated that the pain is usually a seven or eight on a scale of ten. (*Id*. at PageID.96.) Plaintiff was prescribed Norco for the pain but stated that he tries not to take it because its "one of [those] drugs that people are hooked on," referring to an opioid or narcotic drug. (*Id*.) Plaintiff tried to take aspirin and Motrin instead, and stated that with those he can "go through the day fine." (*Id*. at PageID.96-97.) Plaintiff noted that the Norco does make some things easier—for example, if Plaintiff takes Norco he is able to shower standing up instead of using a shower chair. (*Id*. at PageID.98.) Plaintiff testified that it helps the pain in his hip and his back if he can move from sitting to standing frequently. (*Id*. at PageID.99.) Plaintiff stated that he spends more than half of the day laying down. (*Id*.)

At the time of the hearing, Plaintiff was "staying" with his girlfriend. (*Id*. at PageID.100.) He drove "part of the way" to the hearing that day and his girlfriend drove the rest of the way. (*Id*.) Plaintiff testified that he could not drive as long as he used to due to pain from sitting in the car. (*Id*.) Plaintiff does not "grocery shop like most people"—he

can only go in for a quick trip to grab the essentials that he needs. (*Id*. at PageID.101.) Plaintiff appears to refuse the use of an assistive device: "I've always worked, I won't use a damn cane, I won't be in the damn wheelchair, I won't be in a walker. If I can't go do it and walk it, then I'm not going to do it." (*Id*.) Plaintiff's daughter does the yardwork at his house such as mowing the lawn. (*Id*. at PageID.102.) Plaintiff can dress himself, make a sandwich for dinner, and put on slip-on shoes. (*Id*.) Plaintiff cannot do the dishes on his own. (*Id*.)

Regarding his diabetes, Plaintiff stopped taking insulin because of a bad reaction to it he experienced—the alternative was a breathing inhaler option, which cost Plaintiff $5,000 per month, and he was unable to pay for it. (*Id*. at PageID.103.) He said the diabetes was not under control and said, "it is whatever." (*Id*.)

Plaintiff also testified as to headaches, which he said he experiences "all the time." (*Id*.) He elaborated that he has a "mild" headache every day, but he can "deal with it." (*Id*. at PageID.103-04.) Then Plaintiff testified as to his depression, stating that he has not seen a therapist or psychologist, because "they ain't [sic] going to help me." (*Id*. at PageID.104.) He had been taking anti-depression medication that he provided helped "a little bit." (*Id*. at PageID.104-05.) Plaintiff has issues with memory and concentration and needs reminders from his daughter to take his medication, for example. (*Id*. at PageID.105.) Plaintiff testified as to tingling and numbness in "all" his extremities, which made it difficult to use his hands for activities like grasping or gripping objects, such as a cup. (*Id*. at PageID.107-08.) Then the ALJ questioned Plaintiff briefly. (*Id*. at PageID.108-09.) The ALJ asked

Plaintiff what medications he takes, and Plaintiff said, "aspirin and Motrin [and] Norco." (*Id.* at PageID.108.)

### iii.   The Vocational Expert's Testimony at the Administrative Hearing

Next the ALJ questioned the VE. (*Id.* at PageID.109.) The VE classified Plaintiff's past work as tractor trailer truck driver, DOT code 904.383-010, medium work, semi-skilled, SVP 4. (*Id.* at PageID.110.) The VE also classified part of Plaintiff's past work as general construction equipment operator, DOT code 850.638-046, light work, semi-skilled, SVP 4, performed as heavy or very heavy work. (*Id.*)

The ALJ posed the following hypothetical individual, with the same age, education and work experience as Plaintiff, who:

> Would be limited to the range of sedentary work, as normally defined in terms of the lifting, carrying, sitting, standing, and walking; further limited to needing a sit/stand option at intervals as short as 30 minutes; limited to occasional climbing ramps and stairs, no climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no work at unprotected heights; occasionally hand vibration; and then at this hypothetical assume that the individual would be limited to semi-skilled or unskilled work and would have off-task time of less than 10% of the time in a normal workday.

(*Id.* at PageID.110-11.) The ALJ asked whether such an individual would be able to do any of Plaintiff's past work. (*Id.* at PageID.111.) The VE responded that such an individual would not. (*Id.*) When asked whether there would be other jobs in the national economy such an individual could perform, the VE responded that "there would be some information clerk positions, sample DOT code is 237.367-046, about 80,000 [jobs available]; office clerk, sample DOT code is 249.587-018, about 80,000 [jobs available];

interviewer, sample DOT code is 205.367-014, and about 30,000 [jobs available]." (*Id.* at PageID.112.)

Next, the ALJ asked the VE to assume a hypothetical individual with the same limitations as before, but who also was limited to "simple routine repetitive tasks not at a production rate pace, and assume the off-task time in this hypothetical would be more than 20% if the time in a normal workday." (*Id.*) The VE testified that such an individual would not be able to do work in the national economy, stating that 15% of off-task behavior is the maximum that would be tolerated. (*Id.*) The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles, but noted "some aspects are not addressed by the DOT, such as a sit/stand option, time off-task – lets see, production rate, and anything not addressed by the DOT is based on my education and experience[.]" (*Id.*)

Plaintiff's counsel asked the VE a few questions. (*Id.* at PageID.113.) Counsel asked whether an individual who required 15-minute breaks every two to three hours would be work prohibitive. (*Id.*) The VE responded that, assuming those breaks were over and above the "normal breaks" allowed by an employer, such a requirement would make an individual non-competitive. (*Id.*) Counsel then asked whether the same individual also required occasional handling and fingering bilaterally would affect the jobs previously listed by the VE. (*Id.*) The VE responded that all of the jobs previously listed required frequent handling and fingering, so a limitation on those actions would "rule out all the jobs" she previously listed. (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)     Licensed physician (medical or osteopathic doctor);

(2)     Licensed Psychologist, which includes:

  (i)     A licensed or certified psychologist at the independent practice level; or

  (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)      Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)      Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)      Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior

14

administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

(i) Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii) Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii) Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.*   The fourth factor of the SSA's analysis is "specialization."   In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."   These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5).   "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*   Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation

requirements."   The ALJ will consider "source-level articulation."   Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.*  The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we

articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)      Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

(ii)     Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)   Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood,

thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]"  *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as

consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will

consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

> (i)       [D]aily activities;
>
> (ii)      The location, duration, frequency, and intensity of . . . pain;
>
> (iii)     Precipitating and aggravating factors;
>
> (iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)      Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)     Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1)      The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)      The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

#### i.  Dr. Lawley

Plaintiff first argues that the ALJ erred by finding Dr. Lawley's opinion to be "the most persuasive" opinion. (ECF No. 13, PageID.1454.) Plaintiff points out that Dr. Lawley's opinion was prepared as a medical evaluator for Plaintiff's workers' compensation case. (*Id*.) Plaintiff advances that Dr. Lawley's opinion was prepared for the purposes of litigation and was the "basis used to cut off the claimant off of ongoing workers compensation benefits." (*Id*.) Plaintiff ultimately argues that Dr. Lawley's opinion, indicating that Plaintiff did not require any restrictions at all, was inconsistent with the record evidence. (*Id*.)

Defendant points out, "contrary to Plaintiff's assertion," that the ALJ did not in fact find Dr. Lawley's opinion to be the "most persuasive." (*Id*.; ECF No. 19, PageID.14885.) Defendant writes that "[t]he ALJ relied on Dr. Lawley's report in part – but nowhere near to the extent Plaintiff contends." (ECF No. 19, PageID.14885) (citations omitted.) Indeed, I note at the outset that the ALJ found Dr. Lawley's opinion to be only "partially persuasive" and "supportive of a finding that the claimant is able to work," but ultimately

the ALJ "[gave] some deference to the longitudinal treatment history and the claimant's testimony," concluding that "some limitations exist consistent with the residual functional capacity assessed above." (ECF No. 11-2, PageID.68.) To the extent that Defendant argues the ALJ's ultimate RFC finding was inconsistent with the weight given to Dr. Lawley's opinion, the ALJ qualified any weight given to that opinion by noting that the limitations he outlined in the RFC still applied. (*Id*.) This establishes that while the ALJ may have found some support in Dr. Lawley's opinion that Plaintiff could do some work, the ALJ did not adopt the entire opinion as persuasive but rather qualified it with additional limitations.

Still, the undersigned analyzes the ALJ's reliance on Dr. Lawley's opinion. The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.*

The ALJ properly analyzed the supportability and consistency of Dr. Lawley's opinion, and found it partially persuasive, qualifying it with additional restrictions. The ALJ acknowledged that Dr. Lawley "conducted an examination with regard to the claimant's workers compensation claims," and noted that the opinion describes "claimant as having no assistive device for ambulation, full range of motion in the hips, no spasm or

tenderness, [and] having intact sensation and no atrophy." (ECF No. 11-2, PageID.68.) The ALJ found that the opinion was consistent with the medical findings made during the examination and supportive of a finding that Plaintiff was able to work. (*Id.*) The ALJ did not find this completely or to be "the most persuasive," finding it only "partially persuasive"; and in terms of consistency within the record as a whole, the ALJ found that, "giving some deference to the longitudinal treatment history and the claimant's testimony," additional restrictions were required beyond Dr. Lawley's suggestion. (*Id.*) The ALJ did not err in his analysis of Dr. Lawley's opinion or in finding it partially persuasive.

### ii.  Dr. LaClair

Next, Plaintiff argues that the ALJ's decision finding Dr. LaClair's opinion not persuasive is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ erred by failing to properly analyze the consistency and supportability of Dr. LaClair's opinion. (ECF No. 13, PageID.1457-58.) Where the ALJ found that Dr. LaClair's treatment notes, which remained unchanged and verbatim over the course of his treatment, Plaintiff argues that the ALJ improperly discounted the consistency of these opinions, and a finding that the notes were "automatic reproductions . . . rather than actual new physical exam results" was "speculative perception on his part rather than actual facts." (*Id.* at PageID.1458.)

The ALJ noted the following findings from Dr. LaClair's opinion: "claimant could only walk two blocks, stand and walk for a total of two hours, sit for at least six hours, and need to change positions during a work day . . . would need to walk for five minutes every thirty, would need unscheduled breaks, and lift 20 lbs rarely, 10 lbs occasionally, with

additional postural limitations." (ECF No. 11-2, PageID.67.) The ALJ concluded that this opinion was unpersuasive—he found that these findings were "inconsistent with the findings of other examining physicians, including Dr. Lawley[.]" (*Id.*) The ALJ supported this conclusion by writing "Dr. Lawley's opinion is found to be more persuasive as supported by the objective imaging and having great consistency with the overall evidence." (*Id.*) For example, the ALJ noted, "[a] physical exam in October 2018 also noted the claimant had a nontender back with full range of motion in all extremities" and "while he was noted to exhibit some weakness in the right lower extremity than when compared to the left, he had intact sensation, and no focal neurological deficits[.]" (*Id.*) And the ALJ did indeed make note of many apparent verbatim reports by Dr. LaClair: "Dr. LaClair's physical exam findings of the claimant remained essentially unchanged throughout the course of his treatment (which may indicate automatic reproduction or repeating in the files rather than actual new physical exam results)[.]" (*Id.*)

Contrary to Plaintiff's argument, the ALJ did analyze the consistency and supportability of Dr. LaClair's opinion—and found that other medical evidence showed a "nontender back with full range of motion," for example. (*Id.*) The ALJ pointed to specific instances in the record that contradicted Dr. LaClair's opinion, which goes directly to the supportability of his opinion. Whether Dr. LaClair's opinion was consistent, the ALJ did not err in finding it less than persuasive based on the supportability analysis considering the other medical evidence in the record. To the extent that Plaintiff argues the ALJ found Dr. Lawley's opinion *more* persuasive than Dr. LaClair's, this is not necessarily correct.

The opinion finds that Dr. LaClair's opinion was inconsistent with other medical evidence, *including* Dr. Lawleys's opinion. (*Id.*)  The ALJ pointed out that the two opinions were not consistent—to the extent that the ALJ found Dr. Lawley's more supported by the evidence than Dr. LaClair's, I reiterate that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  I suggest that the ALJ's finding of persuasiveness regarding Dr. LaClair's opinion was supported by substantial evidence in the record.

### iii.  Plaintiff's Statements

Finally, Plaintiff argues that the ALJ erred when he "placed emphasis" on Plaintiff's decision not to use insulin as prescribed. (ECF No. 13, PageID.1459.) Plaintiff argues that SSR 16-3p dictates "the ALJ must not draw any inferences about a claimant's symptoms and their functional effects from a failure to seek or follow proportional medical treatment without first considering any explanations that claimant may provide, or other information in the record, that may explain the failure to comply with the recommended treatment." (*Id.* at PageID.1460.) Plaintiff points out that he testified at the hearing his insulin "burns like acid" and that he was having a negative reaction to it. (*Id.* at PageID.1459.) Plaintiff argues that the ALJ did not consider Plaintiff's reasons for failing to take insulin.

The ALJ discussed Plaintiff's alleged symptoms. He noted that Plaintiff did not need reminders for personal care, could grocery shop on a regular basis and for up to an hour, pay bills, and more. (ECF No. 11-2, PageID.62.) Plaintiff reported that he socializes with

friends multiple times a week, had no problems interacting with friends, family, or authority figures, and could follow spoken and written instructions. (*Id.*) Based on those reports from Plaintiff, the ALJ determined "the nature of these reported activities are internally inconsistent, and inconsistent with the allegations of severe pain and disabling symptoms made in connection with this application." (*Id.* at PageID.63.) The ALJ also noted Plaintiff's diabetes and lack of insulin use. He wrote,

> [t]he claimant was advised that he would require insulin, though refused to take any injectable medication as it would interfere with his job. (Exhibit 10F/25). The claimant's non-compliance with medication and the lack of associated signs or symptoms from the diabetes, other than possibly headaches though while being treated for a head laceration with mild cerebral edema on a CT scan, is inconsistent with his allegations of disabling symptoms from the diabetes. It is reasonable to assume that the claimant would be willing to comply with prescribed insulin regimen in order to alleviate discomforting symptoms. (Exhibit 10F).

(*Id.* at PageID.63.)

And the ALJ acknowledged Plaintiff's financial concerns:

> In January 2018, the claimant sought to establish care for his diabetes, noting he was without medication due to a loss of insurance and financial issues. (Exhibit 21F/18). He was again reluctant to use insulin, and reported he does not routinely check his blood sugar. (*Id.*) At a diabetes follow up visit on February 15, 2018, the claimant exhibited a guarded gait and station, though he denied fatigue and appeared in no acute distress. (Exhibit 21F/7.)

(ECF No. 11-2, PageID.64.)

As a rule, I note that this Court has held that "noncompliance is a sufficient reason to discount credibility." *Reid v. Comm'r of Soc. Sec.*, No. 14-11455, 2015 WL 5026118, at *9 (E.D. Mich. Aug. 25, 2015). "[N]on-compliance may lead to the inference that the claimed condition is not as severe as it has been depicted by the claimant." *Id.* (citing *Brown*

*v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996)). Regarding Plaintiff's argument that he declined to take insulin due to the price, a note in the medical record reflects that he had the option to use a free and alternative version—in a medical note from June 26, 2017, a physician's assistant wrote "[a]dvised patient that metformin[1] is available free of charge at Meijer." (ECF No. 11-8, PageID.463.) Plaintiff was offered a free alternative to the medication he could not afford, and apparently did not take advantage of that option— further supporting the notion that "the claimed condition is not as severe as it has been depicted by the claimant." *Reid*, 2015 WL 5026118, at *9. I suggest the ALJ did not err based on this evidence in the record.

But Plaintiff also complains that the ALJ should not have faulted him for failing to take insulin because it caused him adverse side effects. It is true that SSR 16-3p provides, "[a]n individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms." On this issue, courts in this district have held that criticism for failing to take a medication where the claimant expresses concern over side effects is "misplaced" —

> the ALJ's criticism of Webster for ceasing to take Buspar, which she had been prescribed for anxiety, is misplaced. (Tr. 18.) Webster had stopped taking the drug because it made her 'mean' and she did not like it (Tr. 1113), and the Social Security Administration has made clear that an 'individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.'

[1] "Metformin is used to treat high blood sugar levels that are caused by a type of diabetes mellitus or sugar diabetes called type 2 diabetes. With this type of diabetes, insulin produced by the pancreas is not able to get sugar into the cells of the body where it can work properly. Using metformin alone, with a type of oral antidiabetic medicine called a sulfonylurea, or with insulin, will help to lower blood sugar when it is too high and help restore the way you use food to make energy." Mayo Clinic, Drugs and Supplements, Metformin (Oral Route), https://www.mayoclinic.org/drugs-supplements/metformin-oral-route/description/drg-20067074 (last visited September 17, 2021.)

*Webster v. Soc. Sec. Admin.*, 18-cv-00045, 2019 WL1065152, at *19 (M.D. Tenn. Feb. 19, 2019) citing SSR 16-3P, 2016 WL 1119029, at *9 (Mar. 16, 2016); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017) (explaining that "adverse side effects are a reasonable excuse for an applicant to interrupt a prescribed treatment regimen"). Based on SSR 16-3P and Plaintiff's testimony that it caused him uncomfortable side effects, I suggest that the ALJ erred in considering that Plaintiff did not take insulin as a part of finding his subjective reports unreliable.

However, although I suggest the ALJ erred, I recommend finding an error was harmless. It is true that "[s]o long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (citation and quotation omitted); *see also Meuzelaar v. Comm'r of Soc. Sec.*, 648 Fed. App'x 582, 585 (6th Cir. 2016) ("Meuzelaar claims that she should not be held responsible for her lack of health insurance, which purportedly forced her to choose this treatment plan over a more aggressive plan (such as physical therapy or consultation with a surgeon). Even assuming the ALJ should not have relied on Meuzelaar's treatment choice when making the credibility determination, a point we need not decide, any error was harmless, because the other problems with Meuzelaar's testimony amply support the ALJ's credibility finding.") In *Ulman*, the Sixth Circuit held that

> [w]ith the exception of Ms. Ulman's fall from the ladder, the ALJ's decision carefully parses all of the medical records and accords them fair weight. And, those records support a finding of no disability. Dr. Mankoff stated that

claimant could return to work with the very restrictions adopted by the ALJ
in his hypothetical to the vocational expert. Given our highly deferential
standard of review, we must affirm the denial of benefits.

*Ulman*, 693 F.3d at 714. The same is true here.  Even though the ALJ did not acknowledge

Plaintiff's side effects as a reason for not taking the medication, the ALJ ultimately found

that the record did not support Plaintiff's subjective complaints—regardless of his diabetes,

or the treatment (or lack thereof) of his diabetes.

The record shows inconsistent evidence regarding Plaintiff's ability to perform daily

tasks despite his alleged pain and differing reports of pain in medical reports: as the ALJ

noted, Plaintiff could grocery shop on a regular basis and for up to an hour, pay bills, spend

time with friends multiple times a week, and had no problems interacting with friends,

family, or authority figures, and could follow spoken and written instructions. (ECF No.

11-2, PageID.62.) Specifically regarding his diabetes, the ALJ wrote that Plaintiff's exams

"noted no focal neurological deficits, and full range of motion of the extremities without

crepitus or edema (Exhibit 10F/9, 13, 18, 23.)[.]" (ECF No. 11-2, PageID.63.) Plaintiff

does not point out any evidence in the record to contradict or otherwise bring into question

the ALJ's findings. Thus, I suggest sufficient evidence exists in the record to contrast

Plaintiff's complaints of pain to discount Plaintiff's credibility on this issue of his diabetes,

even considering his side effects as reason for not taking the medication. I recommend

deferring to the ALJ on this subjective symptom analysis and finding that he did not err in

reaching his conclusion.

This Court has previously held that noncompliance with prescribed treatment is enough to "discount credibility." *Reid*, 2015 WL 5026118, at *9. I suggest the ALJ did not err regarding his analysis based on Plaintiff's financial concerns but erred regarding his analysis by failing to consider Plaintiff's reported side effects as reason for not taking the medication. However, still, I suggest this error was harmless given the evidence in the record of Plaintiff's functionality and medical reports, which substantially supported the ALJ's analysis and conclusion.

For these reasons, I recommend finding that the ALJ's findings were supported by substantial evidence.

### H. Conclusion

For the previously discussed reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 13), **GRANTING** Defendant's motion, (ECF No. 19), and affirming the decision.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States*

*v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 24, 2021                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge